**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | Master Docket No. 2:18-mn-2873 <br><br> MDL No. 2873 |
| BRICK TOWNSHIP MUNICIPAL UTILITIES AUTHORITY, <br><br>        Plaintiff, <br><br>   v. <br><br> 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC. (f/k/a DOWDUPONT, INC.); AMEREX CORPORATION; ARCHROMA U.S., INC.; ARKEMA, INC.; BUCK EYE FIRE EQUIPMENT COMPANY; CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AGC CHEMICALS AMERICAS, INC. (a/k/a ASAHI GLASS FLUOROPOLYMERS USA, INC.); CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS, INC.; DAIKIN AMERICA, INC.; DYNAX CORPORATION; SOLVAY SOLEXIS, INC.; KIDDIE PLC; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; AUSIMONT USA, INC.; TYCO FIRE PRODUCTS LP, as Successor-in-interest to the Ansul Company; | JUDGE RICHARD GERGEL <br><br> CIVIL ACTION NO.: <br><br><br> **COMPLAINT AND JURY DEMAND** |

| UNITED TECHNOLOGIES CORPORATION; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE Interlogix, Inc.); AND ABC CORPORATIONS 1-50, INCLUSIVE,         Defendants. | |
|---|---|

## **TABLE OF CONTENTS**

**I. INTRODUCTION**…………………………………………………………………4

**II. PARTIES**……………………………………………………………………………7

   A. Plaintiff…………………………………………………………..………………7
   B. Defendants…………………………………………………………………… 7

**III. JURISDICTION AND VENUE**………………………………………… 21

**IV. FACTUAL ALLEGATIONS**…………………………………………… 22

   A. PFAS: Their Chemical Characteristics, Risks, and Regulatory Standards…………. 22

       i. PFAS Chemical Characteristics…………………………………………… 22
       ii. PFAS Regulatory History and Standards……………………………… 24

   B. Defendants' Production and Commercialization of PFAS………………………… 27

   C. Defendants' Production and Commercialization of AFFF………………………… 32

   D. Illegal Transfers Between DuPont Defendants…………………………………... 35

   E. NJDEP PFAS Investigation: PFAS Impacts to the South Branch of Metedeconk River……………………………………………………………………………... 38

   F. The BTMUA Has Been Substantially Injured as a Result of Defendants' Use of PFAS....................................................................................................................... 40

**V. CAUSES OF ACTION**…………………………………..………………... 42

**FIRST COUNT**
Strict Liability: Abnormally Dangerous Activity…………...………...……………... 42

**SECOND COUNT**
Strict Products Liability: Failure to Warn……………………………………… 44

**THIRD COUNT**
Strict Products Liability: Defective Design…………………………………………….. 47

**FOURTH COUNT**
Private Nuisance……………………………………………...…………………………… 50

**FIFTH COUNT**
Public Nuisance……………………………………………………………………………… 51

**SIXTH COUNT**
Trespass……………………………………………………………………………………… 52

**SEVENTH COUNT**
Negligence (Against All Defendants)....…………………………...………………….... 53

**EIGHTH COUNT**
Fraudulent Transfer: Constructive Transfer………...…………………………….....…. 55

**NINTH COUNT**
Fraudulent Transfer: Actual Transfer……………………………………………………... 56

**PRAYER FOR RELIEF**……………………………………………….………………….. 58

**DEMAND FOR JURY TRIAL**……………………………………………………… 59

Plaintiff, Brick Township Municipal Utilities Authority (the "BTMUA" or "Plaintiff"), a public drinking water provider having its principal office at 1551 NJ-88, Brick Township, in the County of Ocean, State of New Jersey, by and through its attorneys, files this Complaint against the above-captioned defendants and alleges as follows:

## I. <u>INTRODUCTION</u>

1.     BTMUA brings this civil action to recover the costs necessary to construct and operate a granular activated carbon system (the "GAC System") required to protect the public and to treat its damaged primary raw water supplies, the Metedeconk River, Reservoir Intake, and groundwater wells from exposure to contamination of per- and poly-fluoroalkyl substances ("PFAS"), including but not limited to, perfluorooctanoic acid ("PFOA").

2.     Defendants 3M Company; E.I. DuPont de Nemours and Company; DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.); The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; AGC Chemicals Americas, Inc. (a/k/a Asahi Glass Fluoropolymers USA, Inc.); Amerex Corporation; Archroma U.S., Inc.; Arkema, Inc.; Buck Eye Fire Equipment Company; Corteva, Inc.; Carrier Global Corporation; Chemdesign Products, Inc.; Chemguard, Inc.; Chemical, Inc.; Dynax Corporation; Kiddie PLC; National Ford Chemical Company; National Foam, Inc.; Tyco Fire Products LP, as Successor-in-Interest to the Ansul Company; United Technologies Corporation; UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.); Daikin America, Inc.; Solvay Solexis, Inc.; Ausimont USA, Inc.; and ABC Corporations 1-50, inclusive (collectively the "Defendants"), manufactured, marketed, sold, supplied and/or promoted PFAS products and/or products that contain and/or degrade to PFOA that were discharged to the Metedeconk River and water supply. As used herein, the term

"PFOA" includes all of its salts and ionic states as well as the acid forms of the molecules and its chemical precursors.

3.     PFAS and PFOA are persistent, toxic, and bioaccumulative compounds when released into the environment.

4.     Plaintiff brings this action to address the widespread contamination with PFAS of its water sources that provide drinking water, to recover the costs and expenses associated with the contamination of its water sources and drinking water, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminate the Plaintiff's water sources do not present a risk to the public.

5.     Defendants are companies that designed, manufactured, marketed, distributed, and/or sold PFAS and PFOA, the chemical precursors of PFAS and PFOA, and/or products containing PFOA and perfluorooctane sulfonic acid ("PFOS"), and/or their chemical precursors. Defendants made products with PFAS including but are not limited to, Teflon®, Scotchguard®, waterproofing compounds, stainproofing compounds, waxes, cloth coatings, paper and food package coatings like Zonyl®, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF.

6.     BTMUA owns and operates a regional public water system serving a range of residential, commercial, and industrial customers in the Township of Brick and the municipalities of Point Pleasant Beach, Point Pleasant Borough, and Howell Township, with a total service population of approximately 100,000 residents.

7.    The Metedeconk River ordinarily supplies approximately seventy percent (70%) of the BTMUA's raw surface water on an annualized average basis.

8.    The remaining water that BTMUA supplies comes from its Reservoir and thirteen (13) groundwater wells.

9.    Studies conducted by the BTMUA in collaboration with New Jersey Department of Environmental Protection ("NJDEP") and independent studies have demonstrated that the Metedeconk River has been and is still being contaminated with PFOA and other PFAS.

10.    PFOA is highly toxic, not easily biodegradable, persistent in the environment and poses a significant risk to human health and safety. PFOA is associated with a variety of illnesses, including cancer, and is considered particularly dangerous to pregnant women and young children.

11.    Defendants knew or should have known that PFOA is highly soluble in water, extremely mobile, persistent, very likely to contaminate surface and groundwater, including drinking supplies, and presents a significant risk to human health and welfare if released into the environment.

12.    Nonetheless, Defendants manufactured, marketed, distributed, sold, and/or promoted products that contained PFOA or would degrade to PFOA.

13.    Defendants had knowledge that PFOA would be discharged to the land and water when used among normal and foreseeable uses.

14.    Further, among other things, the Defendants knowingly and willfully manufactured, promoted, and sold PFAS and PFOA-based products, including, but may not be limited to, AFFF and fluorosurfactant additives, when they knew or reasonably should have known that these harmful compounds would reach aquifers, groundwater and surface water,

pollute drinking water supplies, render drinking water unusable and/or unsafe, and threaten public health and welfare, as they have done with respect to Plaintiff's water supply

15.    BTMUA files this lawsuit to abate the discharge of PFOA and other PFAS into the Metedeconk River, and BTMUA's other water sources including its  reservoir and groundwater wells, and to recover compensatory damages and all other available remedies, including, but not limited to, all necessary funds to reimburse BTMUA for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFOA and other PFAS from its water supply, including all associated costs and damages, and to ensure that the parties responsible for contaminating BTMUA's raw surface water supply bear these expenses, rather than BTMUA and its customers.

## II. PARTIES

### A.  Plaintiff:

13.    Plaintiff BTMUA, having its principal place of business located at 1551 NJ-88, Brick Township, New Jersey 08724, is a municipal utility authority of the State of New Jersey responsible for providing clean drinking water to residents of Brick Township and surrounding municipalities pursuant to N.J.S.A. 40:14B-1, *et seq*.

### B.  Defendants:

14.    Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55133.

15.    3M conducts business throughout the United States, including the State of New Jersey.

16.    Upon information and belief, 3M researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold products and raw materials

containing PFAS in markets around the United States, including within New Jersey, since at least the 1970s. These product and raw material sales were based on intentional direction at the New Jersey market for these products and raw materials and availment of New Jersey laws.

17.    Upon information and belief, 3M manufactured, marketed, promoted, distributed, and/or sold PFOA products or products that degrade into PFOA.

18.    Upon information and belief, 3M manufactured, marketed, promoted, and/or distributed FC-143 FLUORAD Brand Fluorochemical Surfactant which contains and/or degrades into PFOA.

19.    Defendant E.I. Du Pont de Nemours and Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

20.    DuPont conducts business throughout the United States, including in the State of New Jersey, and is registered to conduct business in the State of New Jersey.

21.    DuPont has been involved in the production and sale of fluorochemical products since the 1950s.

22.    DuPont has also manufactured, distributed, and sold fluorochemical products and raw PFAS chemicals around the United States pursuant to a nationwide marketing campaign, including in the State of New Jersey.

23.    Upon information and belief, DuPont manufactured, marketed, promoted, and/or distributed DU006980 and DU003585 polytetrafluoroethylene ("PTFE") Fluoropolymer Dispersion which contain and/or degrade into PFOA.

24.     Defendants The Chemours Company and The Chemours Company FC, LLC are Delaware corporations duly organized under the laws of the State of Delaware, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

25.     Defendants The Chemours Company and the Chemours Company FC, LLC are collectively referred to as "Chemours" or the "Chemours Defendants" and conduct business throughout the United States, including in the State of New Jersey.

26.     Upon information and belief, in 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both of the Chemours Defendants. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time.

27.     Upon information and belief, in approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company.

28.     As part of this spinoff, Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFAS/PFOA DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spin-off.

29.     DuPont and the Chemours Company, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spin-off.

30.     Upon information and belief, the Chemours Company manufactured, marketed, promoted, and/or distributed PTFE Dispersion products which contain and/or degrade into PFOA.

31.     Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Center Road, Wilmington, Delaware 19805.

32.     Corteva conducts business throughout the United States, including conducting business in the State of New Jersey, and is registered to do business in New Jersey.

33.     Upon information and belief, Corteva was formed through a series of transactions initiated by the merger of DuPont and Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc. ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont.

34.     Upon information and belief, Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale.

35.     Corteva assumed direct liability of DuPont's decades long history of causing widespread PFAS contamination in New Jersey and around the United States.

36.     Defendant DuPont de Nemours, Inc., (f/k/a DowDuPont Inc.) ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

37.    New DuPont conducts business throughout the United States, including in the State of New Jersey.

38.    DowDuPont became New DuPont following the Corteva spin-off.

39.    New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spin-offs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale.

40.    Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants."

41.    Defendant AGC Chemicals Americas, Inc. (a/k/a Asahi Glass Fluoropolymers USA, Inc.) ("AGC") is a corporation duly organized under the laws of the State of Delaware with a principal place of business located at 55 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.

42.    AGC conducts business throughout the United States, including in the State of New Jersey.

43.    Upon information and belief, AGC manufactured, marketed, promoted, and/or distributed Fluon AD1030 PTFE Aqueous Dispersion Resins which contains and/or degrades into PFOA.

44.    Upon information and belief, AGC manufactured, marketed, promoted and/or distributed Fluon AD735 PTFE Aqueous Dispersion Resins under the name Asahi Glass Fluoropolymers USA, Inc., which contains and/or degrades into PFOA.

45.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

46.     Amerex designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

47.     Defendant Archroma U.S. Inc. ("Archroma") is a North Carolina company and does business throughout the United States. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217. Upon information and belief, Archroma was formed in 2013 as part of the acquisition of Clariant Corporation's Textile Chemicals, Paper Specialties and Emulsions business by SK Capital Partners.

48.     Archroma designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used

underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

49.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States. Arkema has its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by Defendant Dupont in 2002.

50.     Arkema designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

51.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation and does business throughout the United States. Buckeye has its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.

52.     Buckeye designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used

underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

53.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation and does business throughout the United States. Carrier has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier was formed in 2020 and is the parent company of Kidde-Fenwal, Inc., a manufacturer of AFFF.

54.    Carrier designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS containing products or additives.

55.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation and does business throughout the United States. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

56.    ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used

underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

57.    Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation and does business throughout the United States. Chemguard has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

58.    Chemguard designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

59.    Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

60.    Chemicals designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used

underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

61.    Defendant Daikin America, Inc. ("Daikin") is a corporation duly organized under the laws of the State of New Jersey with a principal place of business located at 20 Olympic Drive in Orangeburg, New York 10962.

62.    Daikin conducts business throughout the United States, including in the State of New Jersey.

63.    Upon information and belief, Daikin manufactured, marketed, promoted, and/or distributed Daikin-Polyflon PTFE D Series which contains and/or degrades into PFOA.

64.    Defendant Dynax Corporation ("Dynax") is a New York corporation that conducts business throughout the United States. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York 10523-1544.

65.    Dynax designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

66.    Defendant Solvay Solexis, Inc. ("Solvay") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 10 Leonards Lane, Thorofare, New Jersey 08086.

67.    Solvay conducts business throughout the United States, including in the State of New Jersey.

68. Upon information and belief, Solvay manufactured, marketed, promoted, and/or distributed PTFE Dispersion products which contain and/or degrade into PFOA.

69. Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.") is a foreign corporation organized and existing under the laws of the State of Delaware and does business throughout the United States. Kidde P.L.C. has its principal place of business at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

70. Kidde designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS containing products or additives.

71. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

72. Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users,

produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

73.    Defendant National Foam, Inc. ("National Foam") is a Delaware corporation and does business throughout the United States. National Foam has its principal place of business at 141 Junny Road, Angier, North Carolina 27501.

74.    National Foam designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

75.    Ausimont USA, Inc. ("Ausimont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 10 Leonards Lane, Thorofare, New Jersey 08086.

76.    Ausimont conducts business throughout the United States, including in the State of New Jersey.

77.    Upon information and belief, Ausimont manufactured, marketed, promoted, and/or distributed PTFE Dispersion products which contain and/or degrade into PFOA.

78.    Defendant Tyco Fire Products, LP, as successor-in-interest to The Ansul Company ("Tyco"), is a Delaware limited partnership and does business throughout the United

States. Tyco has its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19466. Tyco manufactured and currently manufactures the Ansul brand of products, including Ansul brand AFFF containing PFAS.

79.     Tyco is the successor in interest to the corporation formerly known as The Ansul Company ("Ansul"). At all times relevant, Tyco/Ansul designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

80.     Defendant United Technologies Corporation ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware and does business throughout the United States. United Technologies has its principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

81.     United Technologies designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise

handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS-containing products or additives.

82.    Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation and does business throughout the United States. UTC has its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

83.    UTC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint and/or other PFAS-containing products or additives. Further, Defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting and/or other PFAS containing products or additives.

84.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

85.    All references to a Defendant or Defendants in this Complaint include any predecessors, successors, alter-egos parents, subsidiaries, affiliates, and divisions of the named Defendants.

86.    ABC Corporations, Inclusive (1-50) are the fictitious names of corporations, companies, partnerships and/or other business entities whose identities are currently unknown, and who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold, and/or otherwise released into the stream of commerce AFFF, other PFAS-containing products and/or underlying PFAS-containing chemicals or additives, including those products which contaminated Plaintiff's water sources. These corporations are liable to Plaintiff for not only their own conduct and the conduct of their agents, employees and servants but also under respondeat superior, alter ego, agency principles and/or any corporate relationship. Following further investigation and discovery, the BTMUA will seek leave of this Court to amend this Complaint to allege their true names and capacities, when ascertained. The BTMUA is informed and believes, and on that basis alleges, that each of these fictitiously named parties is a manufacturer, supplier, promoter, distributer, and/or seller of PFOA, AFFF products, products containing PFOA, and/or products that would degrade to PFOA upon release to the environment and is responsible in some manner for the acts alleged herein resulting in the contamination of the BTMUA's raw surface water supply, the Metedeconk River, and its reservoir and groundwater wells.

### III. JURISDICTION AND VENUE

87.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiff and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

88.    Plaintiff is direct-filing this Complaint and Jury Demand in the United States District Court for the District of South Carolina as permitted by Case Management Orders Nos.

3D & 3E entered by this Court in In Re: Aqueous Film-Forming Foams Products Liability Litigation, MDL No. 2:18-mn-2873-RMG.

89.     The Superior Court of New Jersey, Ocean County, is the proper venue of origin where Plaintiff's claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

90.     The Superior Court of New Jersey, Ocean County is the proper "Home Venue" because, pursuant to New Jersey Court Rule 4:3-2(a), BTMUA's causes of action arose in Ocean County and because BTMUA's principal place of business is in Ocean County, New Jersey.

91.     Plaintiff brings causes of action based solely on and arising under New Jersey Law. The claims of Plaintiff are for violations of New Jersey law that occurred exclusively in the State of New Jersey.

## IV. FACTUAL ALLEGATIONS

### A. PFAS: Chemical Characteristics, Risks, and Regulatory Standards

#### i.      PFAS Chemical Characteristics

92.     PFAS are a family of chemical compounds containing fluorine and carbon atoms. PFAS has been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The PFAS family of chemicals is entirely manmade and does not occur in nature.

93.     PFOA is a substance within the PFAS family of chemicals.

94.     PFOA is among the most widely studied PFAS chemicals and has been shown to be toxic at very low concentrations.

95.     PFOA has chemical characteristics that cause extensive and persistent environmental contamination. Specifically, PFOA is mobile and persistent. It is mobile in that is soluble and does not adsorb to soil particles (stick), and it is readily transported through the soil

and into groundwater where it can migrate long distances. It is persistent in that it does not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air and water, these compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

96.    PFAS, including PFOA, bioaccumulate, biopersist, and biomagnify in people and other organisms.

97.    Scientists link PFOA with a wide range of serious public health impacts. Exposure to PFAS by both humans and animals has been linked to several diseases, including but not limited to, kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy-induced hypertension and low birth weight.

98.    PFOA contamination presents a serious threat to public health when contained in and consumed through drinking water.

99.    PFOA enters the environment from industrial facilities that manufacture PFOA, utilize PFOA, utilize products that degrade to PFOA in the manufacture or production of other products, or in the instant matter, when used as a processing aid. Releases to land, air, and water from industrial sites are known pathways to the environment. PFOA may also enter the environment when released from a PFAS-containing products consumer and from commercial products during their use and disposal.

### ii.    PFAS Regulatory History and Standards

100.    In the late 1990's, the U.S Environmental Protection Agency ("EPA") began to review information on PFAS to determine whether PFAS compounds posed a risk to human health and the environment.

101.    On June 16, 2011, the EPA's Office of Ground Water and Drinking Water hosted a public stakeholder meeting to discuss EPA's Preliminary Regulatory Determination for the Third Drinking Water Contaminant Candidate List.

102.    At the June 16, 2011 meeting, EPA published a list of contaminants, including PFOA, which at the time of publication, were known or anticipated to occur in public water systems, and may require regulation.

103.    In or around October 2012, the EPA held an expert review of the Regulatory Determination for the Third Drinking Water Contaminant Candidate List, whereby reviewers provided clarification and agreed with an overall approach for identifying contaminants, including PFOA, for the Regulatory Determination for the Third Contaminant Candidate List.

104.    In or around October 2014, EPA published a Preliminary Regulatory Determination Notice with 60-day opportunity for public comment.

105.    On December 9, 2014, EPA hosted a public stakeholder meeting to discuss the Preliminary Regulatory Determinations for the Third Drinking Water Contaminant List which included PFOA.

106.    On November 17, 2016, EPA published a final list of contaminants under the Fourth Contaminant Candidate List in the Federal Register (81 FR 81099, USEPA, 2016c), naming contaminants known, or anticipated to occur, in public water systems requiring regulation under the SDWA.

107.    PFOA was included in the Final Fourth Contaminant Candidate List.

108.    On March 3, 2021, EPA published a Final Regulatory Determination for Contaminants on the Fourth Drinking Water Candidate List and made final determinations to regulate PFOA in drinking water.

109.    While the USEPA was investigating the hazards of PFOA, individual states, including the State of New Jersey, began to formally investigate the dangers of PFAS and looked to establish health-based maximum contaminant levels ("MCL") for human drinking water consumption.

110.    In 2017, after a thorough investigation, the New Jersey Department of Environmental Protection ("NJDEP") formally proposed a health-based drinking water standard for PFOA. Under the Rules, NJDEP proposed an MCL of 14 parts per trillion ("ppt") for PFOA.

111.    On June 1, 2020, NJDEP adopted amendments to the New Jersey Safe Drinking Water Act rules (N.J.A.C. 7:10), the Private Well Testing Act ("PWTA") rules (N.J.A.C. 7:9E), Ground Water Quality Standards ("GWQS") rules (N.J.A.C. 7:9C), New Jersey Pollutant Discharge Elimination System ("NJPDES") rules (N.J.A.C. 7:14A), and Discharge of Petroleum and Other Hazardous Substance ("DPHS") rules (N.J.A.C. 7:1E).

112.    The rule adoption, which became effective on June 1, 2020, formally established an MCL and groundwater quality standard of 14 ppt for PFOA in the State of New Jersey.

113.    The rule adoption also formally amended the New Jersey List of Hazardous Substances (N.J.A.C. 7:1E) to include PFOA and its salts and esters.

114.    Pursuant to N.J.A.C. 7:10-5.2(a)(5)(ii), all public community water systems, including the BTMUA, were required to monitor for PFAS beginning in the first quarter of 2021, and if a system's drinking water contains PFOA at concentrations exceeding its MCL, water

purveyors are required to take necessary protective measures, which include adding treatment systems or removing impacted wells from service before distributing drinking water to ratepayers. In some circumstances, action is required even if current contamination levels are below the MCL to protect against MCL exceedances. Such state requirements include, but are not limited to, required investigatory and remedial action by public water suppliers to protect public health, including taking action to remove PFAS contamination from its water supply.

115.    On April 10, 2024, the United States Environmental Protection Agency ("USEPA") announced the final National Primary Drinking Water Regulation ("NPDWR") for six varieties of PFAS.

116.    The USEPA's announcement also formally classified PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

117.    The USEPA finalized a NPDWR establishing legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six varieties of PFAS in drinking water. PFOA, PFOS, PFHxS, PFNA, and HFPO-DA as contaminants with individual MCLs, and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL to account for the combined and co-occurring levels of these PFAS in drinking water. EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals ("MCLGs") for these PFAS.

118.    The current MCLs, expressed as Parts Per Trillion ("PPT") are: (1) PFOA 4.0 PPT; (2) PFOS 4.0 PPT; (3) PFHxS 10 PPT; (4) PFNA 10 PPT; (5) HFPO-DA 10 PPT; and (6) any mixture containing two or more PFHxS, PFNA, HFPO-DA, and PFBS is 1 MCLG or 1 unitless Hazard Index point.

119.    The USEPA implemented this rule to significantly reduce the level of PFAS in drinking water across the United States and to establish a nationwide, long-term health protective level for these specific varieties of PFAS in drinking water.

**B.  Defendants' Production and Commercialization of PFAS**

120.    For more than 50 years, Defendants were or should have been aware of the dangers posed to people by exposure to their PFAS products (including via drinking water), and that the production and use of PFAS products resulted in the release of PFOA to the environment. Despite this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public and continued their PFAS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to the BTMUA's drinking water supply.

121.    For most of the past seven decades through the early 2000s, 3M was the only known manufacturer of PFOA in the United States.

122.    3M began producing PFOA as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

123.    3M produced PFOA by electrochemical fluorination beginning in the 1940s.

124.    Electrochemical fluorination results in a product that contains and/or breaks down into compounds containing PFOA.

125.    DuPont began production for sale of PTFE in or around 1951. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon."

126. By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

127. 3M went on to market and promote PFAS and shipped PFAS to manufacturers, including DuPont, throughout the United States, including New Jersey. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to New Jersey and throughout the country for decades until announcing in 2000 that it would cease production of PFOA.

128. 3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

129. DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

130. As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

131. By the 1970s, 3M became concerned about exposure to fluorochemicals in the general population.

132. By at least 1970, 3M was aware that its PFAS products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution to nearby raw surface waters.

133.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA, a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

134.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

135.    Other studies by 3M in 1978 showed that PFOA is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFAS. DuPont was aware of 3M's findings no later than 1981.

136.    Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to C8, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from workers and analyzing them for the presence of fluorine.

137.    In the late 1970s, 3M studied the fate and transport characteristics of PFAS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

138.    According to a 3M environmental specialist who resigned from his position due to the company's inaction over PFAS's environmental impacts, 3M had resisted calls from its own

ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFAS. At the time of the specialist's resignation in 1999, that resistance had not ceased.

139.    In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

140.    In 1983, 3M scientists opined those concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

141.    DuPont was long aware it was releasing PFAS from its facilities and that PFAS were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware in 1984, to discuss health and environmental issued related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA from its operations. DuPont chose not to use either, despite knowing pf PFOA's toxicity.

142.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use and had "no incentive to take any other position."

143.    In 1984, 3M's internal analyses demonstrated that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

144.    By at least 1993, Defendants were aware that PFAS were linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time, published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

145.    Despite its understanding of the hazards associated with its PFAS products, 3M actively sought to suppress scientific research on the hazards associated with those products and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and ecological risks of its PFAS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

146.    In response to pressure from the EPA, 3M began to phase out production of PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFAS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

147.    All Defendants knew or should have known that in their intended and/or common use, their PFAS products would very likely injure and/or threaten public health and the environment. This information was accessible to all Defendants.

## C.  Defendants Production and Commercialization of AFFF

148.    For most of the past 30 years, the primary manufacturer of PFOS and PFOA has been 3M, through its supply of AFFF.

149.    In the 1960s, 3M began developing AFFF, which was created to extinguish Class B fires that are fueled by flammable liquid and particularly difficult to fight using traditional methods of extinguishing fires. Class B fires cannot be safely extinguished with water.

150.    AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, a solution forms producing aqueous film that spreads across the surface of a hydrocarbon fuel. This film formation feature is what provides the fire extinguishment.

151.    3M manufactured, marketed, and sold AFFF and the raw materials for production of AFFF from the 1960s to the early 2000s. 81. National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

152.    Angus Fire and Chemguard began to manufacture, market, and sell AFFF in the 1990s.

153.    Dynax began to manufacture, market, and sell the raw materials for production of AFFF in the 1990s and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

154.    Buckeye began to manufacture, market, and sell AFFF in the 2000s.

155.    After its creation in the 1960s and entrance into the commercial market, AFFF was utilized by the Department of Defense and the US Navy to extinguish fuel-based fires during routine military drills. AFFF was also used in hundreds of bases across the country.

156.    Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

157.    In 2000, 3M announced it would phase out and find substitutes for its PFOS chemistry.

158.    In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition ("FFFC").

159.    In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

160.    Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

161.    After 3M exited the AFFF market, the remaining Defendants continued to manufacture and sell AFFF.

162.    The Defendants knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

163.    While the Defendants phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that they should not use AFFF that contained PFOS, PFOA, PFNA and/or PFHxS, and/or their precursors.

164.    The Defendants further did not act to remove AFFF from the stream of commerce.

165.    The Defendants did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of public water drinking wells.

166.    Accordingly, for many years after the original sale of AFFF, these AFFF products were and are still being applied directly to the ground, discharged into floor drains and washed into sediments, soils and waters, contamination public drinking water wells and endangering human health.

167.    The Defendants did not properly instruct users, consumers, public officials or those who were in a position to properly guard against the dangers of PFAS, that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

168.    Additionally, Defendants manufactured and/or supplied PFAS-containing products or additives that were used in the manufacturing of and/or incorporated into consumer and commercial products. As a result of these other PFAS-containing products, PFAS, particularly PFOA and PFOS, also may have directly entered the environment through different pathways of contamination to aquifers and/or ground or surface waters, which were released and/or migrated into Plaintiff's water sources.

169.    In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchguard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, paper and food package coatings like Zonyl®, and through use of PFAS-containing cook wear, including Teflon®.

170.    Upon information and belief, the Defendants sold PFAS, PFAS-containing products and/or PFAS-containing chemicals or additives to companies with New Jersey locations that Defendants knew or should have known would be used and/or disposed of in New Jersey.

### D.  Illegal Transfers Between DuPont Defendants

171.    In  approximately  2014,  DuPont  formed  The  Chemours  Company  as  a  wholly owned subsidiary. The Chemours Company had a separate board of directors, but that board was controlled by DuPont.

172.    In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included  at  least  titanium  technologies,  fluoroproducts,  and  chemical  solutions.  The fluoroproducts  and  chemical  solutions  transfers  appear  to  have  been  made  to  The  Chemours Company and The Chemours Company FC, LLC (again, collectively "Chemours").

173.    In  addition  to  the  transfer  of  these  business  lines,  Chemours  assumed  various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.[1]

174.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing  product  lines.  Significantly,  DuPont  pinned  on  Chemours  its  historic  (and  future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a  reasonably  equivalent  value  exchange  for  this  transfer  or  obligation.  Likewise,  the  assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

---

[1] For instance, various of The Chemours Company's and DuPont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

175.    At the time of the DuPont-Chemours transfer, the performance chemicals business held an estimated debt of approximately $4 billion.

176.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

177.    Per the separation agreement governing the DuPont-Chemours spin-off, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. DuPont has asserted this indemnification is uncapped. Chemours also agreed to indemnify DuPont against, and assume for itself, the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

178.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement, or action relating to the environmental liabilities it assumed.

179.    At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

180.    Until the completion of the spin-off, Chemours was a wholly owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours's board were appointed. The spin-off and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

181. DuPont's knowledge and assessment of its liabilities, including environmental and other performance chemicals liabilities, have been comprehensive since it began its performance chemical operations, and litigation-related liabilities have been increasing since at least the early 2000s. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act, related to its PFAS compounds. Although seemingly small, this was the largest PFAS-related penalty in history at the time it was levied.

182. Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFAS chemicals.

183. In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

184. Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

185. At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

186.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including the claims that arise out of this case, which has and will further harm the BTMUA.

**E. NJDEP PFAS Investigation: PFAS Impacts to the South Branch of Metedeconk River**

187.    Investigations and studies conducted by the BTMUA in collaboration with the NJDEP have demonstrated that the Metedeconk River has been and is continuing to be contaminated with PFOA and other PFAS originating in whole or in part from a groundwater plume in an industrial park in Lakewood, New Jersey, attributable to that facilities' use of PFOA in the manufacturing of coating and laminating fiberglass fabrics and industrial textiles.

188.    In 2009, NJDEP conducted a statewide PFAS Occurrence Study (the "2009 Study") of drinking water sources for thirty-one (31) community water systems throughout the State of New Jersey.

189.    The results of the 2009 Study revealed that the South Branch of the Metedeconk River in central New Jersey exhibited the highest concentration of PFOA of any surface water source tested in the State.

190.    Following NJDEP's 2009 Study, the BTMUA undertook a sampling campaign in December of 2010 (the "December 2010 Study") to quantify the range of PFAS concentrations

along the South Branch of the Metedeconk River and to identify the location or locations of a potential PFAS sources.

191.    Through this testing, the BTMUA detected PFOA concentrations as high as 150 ppt in the South Branch of the Metedeconk River and isolated the location of the PFOA source to a roughly 3 square mile area along the South Branch of the Metedeconk River in Lakewood Township, New Jersey.

192.    BTMUA then initiated a track down study officially called "Identification of Perfluorinated Compounds[1] in the Metedeconk River Watershed" in collaboration with NJDEP's Office of Science in 2011 (the "Joint Track Down Study").

193.    The Joint Track Down Study concluded that PFOA is the primary contaminant of concern with respect to the South Branch of the Metedeconk River's water quality.

194.    Through groundwater sampling, the Joint Track Down Study discovered a large groundwater plume contaminated with PFOA and other PFAS, believed to be the source of PFOA in the South Branch of the Metedeconk River.

195.    Based upon the data obtained during the Joint Track Down Study, a conceptual PFOA contaminated groundwater plume was developed that identified the likely source of PFOA in the South Branch of the Metedeconk River from properties located in Lakewood Township.

196.    Upon information and belief, the contaminated groundwater plume, in whole or in part, originates from an industrial park in Lakewood, New Jersey ("Lakewood Facility"), with known use of PTFE and fluoroelastomer products containing PFOA as part of its coating and laminating processes for fiberglass fabrics and industrial textiles.

---

[1] Per- and polyfluoroalkyl substances (PFAS) were previously referred to as perfluorochemicals or compounds. (PFCs)

197.    PFOA was detected at six different water sources that BTMUA utilizes to supply water to its customers, including the Metedeconk River, its reservoir, and groundwater wells.

198.    The highest PFOA concentrations detected at these sites are as follows: (1) Well #6 6.7 PPT; (2) Well #13 16.0 PPT; (3) Well #14 63.0 PPT; (4) Reservoir to WTP 24 PPT; (5) Reservoir Fill 59.0 PPT; and (6) Metedeconk River Intake 98.0 PPT.

199.    PFOS concentrations, which were measured at levels which are now in excess of federal and New Jersey MCL standards, were also detected in Well #14, the Reservoir, and the Metedeconk River.

200.    PFNA concentrations, which were measured at levels which are now in excess of the federal and New Jersey MCL, standards were also detected in Well #14.

**F.  The BTMUA Has Been Substantially Injured as a Result of Defendants' Use and Discharge of PFAS and AFFF Into the BTMUA's Water Supply**

201.    PFAS have been detected in the BTMUA's raw surface water, reservoir, and wells. PFOA's high mobility and persistence in soil, surface water and groundwater mean that this hazardous substance, and those like it, will continue to spread and negatively affect the BTMUA's water supply in the future unless abated using necessary filtering technology.

202.    The Lakewood Facility's use of PTFE dispersion products containing PFOA, manufactured, marketed, promoted, and supplied by the Defendants, is a known source of PFOA released into the environment that ultimately reached the Metedeconk River, reservoir and groundwater wells.

203.    PFOA has reached the Metedeconk River due to the routine, foreseeable, and intended use and disposal of Defendants' PTFE dispersion products containing PFOA compounds in the vicinity of locations from which the BTMUA obtains water for purification and distribution.

204.    As a direct result of Defendants' acts and omissions, the BTMUA has had to address PFOA contamination in its water supply. In doing so, the BTMUA has, *inter alia*, at great cost has been forced to abandon a portion of its Metedeconk River usage and obtain a temporary water allocation permit from NJDEP.

205.    In February of 2017, the BTMUA met with NJDEP to discuss alternative water sources that could be used while treatment of PFOA in the Metedeconk River was addressed.

206.    During the February 2017 meeting between the BTMUA and NJDEP, it was determined that the BTMUA would be required to seek a modification of its Water Allocation Permit to increase its annual diversion limit from clean alternative water sources to blend with water from the Metedeconk River to achieve a lower concentration of PFOA in its drinking water while treatment of PFOA was addressed.

207.    Approval of modification to the BTMUA's Water Allocation Permit was conditioned on the BTMUA constructing a Granular Activated Carbon System ("GAC System") to treat and remove PFOA from its raw surface water supply.

208.    The most viable technology to safely remove PFOA chemical compounds from drinking water is the GAC System. The GAC technology is extremely expensive to build, install, operate, and maintain.

209.    Moreover, the BTMUA has incurred substantial expenses in developing a treatment to address PFOA chemical compounds in its water supply, including performing a Feasibility Study for potential water treatment systems capable of filtering and removing PFOA contamination from its water supply.

210.    In order to counter the ongoing harmful threats posed by PFOA to the public and the BTMUA's customers, the BTMUA has been forced to contract for and construct the GAC System in order to ensure purification of its water supply for public consumption.

211.    The BTMUA has incurred approximately $22.5 million in costs to construct the GAC System and the BTMUA estimates that it will cost $4.6 million to operate and maintain the GAC System in its first year of operation.

212.    The BTMUA will continue to incur additional costs each year to operate and maintain the GAC system.

## V. CAUSES OF ACTION

### FIRST COUNT

### Strict Liability: Abnormally Dangerous Activity

213.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 212 of this Complaint as if fully set forth herein.

214.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the aquifers, surface waters and/or groundwater that serve as water sources for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

215.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

216.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

217.    By causing PFAS contamination and the resulting impact on Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity(ies) for which they are strictly liable.

218.    As a result of Defendants' abnormally dangerous activity(ies), Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

219.    As a direct and proximate result of Defendants' acts and omissions and their abnormally dangerous activities, the BTMUA has had to expend significant sums to investigate the source and extent of the contamination, and/or expend significant sums to plan for treatment of its water to make it safe.

220.    As a direct and proximate result of Defendants' acts and omissions and their abnormally dangerous activities, Plaintiff has incurred and will incur additional costs for the construction of water treatment facilities capable of removing PFAS, including PFOS and PFOA, from its water supply, additional costs in the future for the operation and maintenance of those water treatment facilities and additional costs complying with federal and state regulations or guidelines arising from PFAS, including PFOS and PFOA, contamination of Plaintiff's groundwater and surface water sources and/or drinking water.

221.    Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

222.    Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

## SECOND COUNT

### Strict Products Liability for Failure to Warn

223.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 222 of this Complaint as if fully set forth herein.

224.    As manufacturers and/or sellers of PFAS products, Defendants had a strict duty to the BTMUA to warn users of those products of the foreseeable harms associated with those products.

225.    At all times relevant, Defendants were in the business of, among other things, designing, manufacturing, selling, or otherwise distributing AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products.

226.    At all times relevant to this litigation, Defendants' AFFF and PFAS surfactants for use in or manufacture of AFFF and/or other products reached their intended consumers and users without substantial change in their conditions as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

227.    Defendants inadequately warned users and buyers of their PFAS and AFFF products normal use, and of the widespread, toxic, and persistent effects of such releases. To the extent Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of drinking water that resulted from those products. Indeed, despite Defendants' own unique knowledge of such hazards, they elected to withhold such knowledge

from the BTMUA, regulators, and the public, to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards; and to instruct users to release their products directly to the ground where PFOA therein could infiltrate drinking water supplies.

228.    Defendants failed to warn of the hidden dangers associated with their PFAS and AFFF products before the products left their control, and at all stages of the chain of commerce; at no time relevant to this Complaint did Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

229.    Defendants' PFOA products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of the products.

230.    PFOA products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water that are pathways to the Metedeconk River that supplies the BTMUA's raw surface water along with its reservoir and groundwater wells.

231.    Defendants knew or should have known that the use of PFAS and AFFF products in their intended manner would result in the discharge, disposal, or release of PFOA onto land or into water, such that PFOA would contaminate raw surface water supplies.

232.    Defendants failed to provide warnings for the reasonably foreseeable risk that use of Defendants' AFFF and/or PFAS surfactants for use in or manufacture of AFFF and/or other products could result in the contamination of aquifers, groundwater and/or surface water and, ultimately, drinking water supplies.

233.   The PFAS and AFFF products used and disposed of in a manner that caused contamination of the BTMUA's raw surface water supply were defective in design and unreasonably dangerous products.

234.   It is expected that Defendants' PFAS and AFFF products would come into contact with the Metedeconk River.

235.   Had Defendants provided adequate warnings about the hazards associated with their PFOA products, third-party users would have heeded that warning.

236.   As a direct and proximate result of Defendants' failure to warn of the hazards of their PFOA products that were, or reasonably should have been, known to them, the BTMUA's primary source of drinking water is contaminated with PFOA and AFFF.

237.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, the BTMUA has incurred, is incurring, and will continue to incur damages related to PFAS and AFFF contamination in an amount to be demonstrated at trial.

238.   Defendants' distribution of their defective products, despite their knowledge of the defects, including the increased risks of widespread contamination of the groundwater, surface water, and drinking water supplies with toxic and carcinogenic chemicals and the risks to the unsuspecting residents in surrounding areas was so reckless or wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, or rights of the Plaintiff and the residents and businesses who rely on the drinking water that Plaintiff provides.

239.   Defendants knew it was substantially certain that their acts and omissions described herein caused injury and damage, including PFOA and AFFF contamination of the Metedeconk River and BTMUA reservoir, and groundwater wells. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful

disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFOA products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA from their waste stream, despite the impacts on the BTMUA's drinking water supply and on public health and welfare. Therefore, the BTMUA requests an award of punitive damages for Defendants' especially egregious and outrageous conduct and to discourage Defendants from engaging in similar misconduct in the future. The BTMUA requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

240.    Defendants' conduct was so reckless or wanting in care that it constituted intentional misconduct.

241.    Defendants are strictly, jointly, and severally liable for all such damages, and the BTMUA is entitled to recover all such damages and other relief as set forth below.

## THIRD COUNT
### Strict Products Liability for Defective Design

242.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 247 of this Complaint as if fully set forth herein.

243.    As manufacturers and/or sellers of PFOA products, Defendants had a strict duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses, and owed that duty both to reasonably foreseeable users of those products and to any person who might reasonably be expected to come into contact with those products.

244.    Defendants knew that third parties would purchase PFOA products and use them without inspection for defects.

245.    PFOA products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or waters. Such discharges occurred at various locations, at various times, and in various amounts. PFOA resulting from such discharges moved through the environment and did not degrade, and eventually contaminated the BTMUA's raw surface water supply.

246.    The PFOA products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

247.    Defendants knew or reasonably should have known that the use of their PFOA products in an intended or reasonably foreseeable manner would result in the spillage, discharge, disposal, or release of PFOA onto land or into water such that PFOA foreseeably contaminated the BTMUA's raw surface water supply.

248.    The PFAS products that are injuring the BTMUA are defective in design and unreasonably dangerous because, among other things:

a.    PFOA causes extensive and persistent contamination when it, or products containing it, is used in a reasonably foreseeable or intended manner.

b.    As manufacturers and/or sellers of PFOA products, Defendants had a strict duty to the BTMUA to warn users of the foreseeable harms associated with those products.

c.    Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFOA products.

249.    At all times relevant to this action, PFOA products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and the foreseeable risk of

harm to public health and welfare via drinking water contamination posed by PFOA products outweighed the cost to Defendants of reducing or eliminating such risk.

250.    Defendants knew or should have known about reasonably safer feasible alternatives to PFOA products, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

251.    As a direct and proximate result of Defendants' failure to warn of the hazards of their PFOA products that were, or reasonably should have been, known to them, the BTMUA's raw surface water supply is contaminated with PFOA.

252.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the BTMUA has incurred, is incurring, and will continue to incur damages related to PFOA contamination of its raw surface water supply in an amount to be proved at trial.

253.    Defendants knew it was substantially certain that their acts and omissions described herein would cause injury and damage, including PFOA contamination of the BTMUA's raw surface water supply. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Such conduct was performed to promote sales of their PFOA products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA from their waste streams, despite the impacts on the BTMUA and on public health and welfare. Therefore, the BTMUA requests an award of punitive damages for Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. The BTMUA requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

## FOURTH CAUSE OF ACTION
### Private Nuisance

254.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 253 of this Complaint as if fully set forth herein.

255.    The BTMUA has water rights which permit it to extract raw surface water for use in its water system.

256.    The release and disposal of PFOA products have caused an intentional, unreasonable, and negligent interference with the BTMUA's use and enjoyment of its water supply.

257.    The PFOA contamination resulting from the release and disposal of PFOA has proximately caused and continues to cause the BTMUA to suffer harm and incur costs and expenses.

258.    The nuisance caused by Defendants is a continuous and substantial interference with the BTMUA's right to use and enjoy its property.

259.    The nuisance caused by Defendants is capable of being removed and remediated from the site.

260.    Defendants owe a continuing duty to remove and remediate the nuisance and have failed to do so.

261.    The BTMUA has incurred substantial costs and expenses and will continue to do so to investigate and remediate the PFOA contamination.

262.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA contamination of the BTMUA's water supply. Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be

harmed by those acts or omissions. Defendants knew for decades of the dangers posed by their products. Therefore, the BTMUA requests an award of punitive damages for all Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. The BTMUA requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

### FIFTH COUNT
**Public Nuisance**

263.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 262 of this Complaint as if fully set forth herein.

264.    Through Defendant's acts and omissions, Defendants' PFOA and PFOA-containing products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, the BTMUA's right to a clean environment, which right, the BTMUA holds in common with members of the public, and which right is specifically permitted.

265.    Through Defendants' acts and omissions, Defendants' PFOA and PFOA-containing products, including AFFF, have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, the BTMUA's right to the use of surface water as a source of potable water, which right the BTMUA holds in common with members of the public, and which right is specifically permitted.

266.    The public nuisance created by Defendants is continuing.

267.    Defendants have failed, and continue to fail, to abate the public nuisance.

268.    As a result of the public nuisance, the BTMUA has suffered and continues to suffer, significant harm and damages special to the BTMUA and different from those the general

public may have suffered, including investigation and removal costs and damages related to the detection, treatment, and removal of PFOA constituents that have and will continue to migrate into the BTMUA's raw surface water supply, such that Defendants should be required by injunction to abate the public nuisance they have created.

## SIXTH COUNT
### Trespass

269.    BTMUA repeats and realleges each allegation of Paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.    BTMUA is entitled to exclusive possession of its raw surface water supply in the Metedeconk River under permit.

271.    The presence of PFAS in the Metedeconk River constitutes a physical invasion of the BTMUA's permitted interest in the Metedeconk River without the BTMUA's permission or license.

272.    Defendants are jointly and severally liable for trespass, and continued trespass, because Defendants recklessly caused PFOA to be present in the BTMUA's water supply, as described herein.

273.    As long as the BTMUA's water supply in the Metedeconk River remains contaminated with PFOA due to Defendants' conduct, the trespass will continue.

274.    The BTMUA is harmed by the presence of Defendants' PFOA in the Metedeconk River, including, but not limited to, being able to use the raw surface water of the Metedeconk River, BTMUA reservoir, and groundwater wells, and by incurring expenses in planning for, constructing, operating, and maintaining treatment infrastructure to remove PFAS-laden raw surface water from its drinking water supply.

275.    The Defendants' use and storage of hazardous substances at the Property, including but not limited to PFOA, were discharged into the groundwater with a direct hydrological connection to the Metedeconk River that caused contamination to Plaintiff's primary water supply used to provide clean drinking water to Brick Township residents and its ratepayers.

276.    Defendants knew it was substantially certain that their acts and omissions described herein would cause injury and damage, including PFOA contamination of the environment, including the Metedeconk River, the raw surface water supply used by the BTMUA. Defendants committed each of the above-described acts and omissions with a wanton and willful disregard of persons who foreseeably might be harmed.

## SEVENTH COUNT
### Negligence

277.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 276 of this Complaint as if fully set forth herein.

278.    As users and dischargers of PFAS products, the Defendants owed a duty to the BTMUA of its use and discharge of PFAS and the hidden dangers associated with release to the environment of PFAS in those products.

279.    Defendants breached this duty by inadequately warning the BTMUA of their PFAS products and the likelihood that the release of their products would cause PFAS to be released to the environment during their normal, intended and foreseeable use, and of the widespread, toxic, and persistent effects of such releases. To the extent Defendants provided warnings about their products, such warnings did not convey a fair indication of the nature and extent of the hidden dangers of Defendants' products to the mind of a reasonable user, because, among other things, they lacked descriptions of the nature and extent of the contamination of

drinking water in the Metedeconk River that resulted from those products. Despite Defendants own unique knowledge of such hazards, they elected to withhold such knowledge from the BTMUA, regulators, and the public; and to affirmatively distort and/or suppress their knowledge and the scientific evidence linking their products to such hazards.

280.    Defendants breached this duty when they utilized and discharged PFAS-laden products even though they knew or should have known of the dangers that PFAS posed to drinking water supplied. Defendants should have known that the manner in which they were utilizing their PFAS products would result in and cause contamination of the BTMUA's raw surface water supply.

281.    Defendants failed to warn of the hidden and known dangers associated with their PFAS-laden products and at no time relevant to this Complaint did Defendants warn that their products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

282.    As a direct and proximate result of the Defendants' failure to warn of the hazards of their PFAS-laden products, including AFFF, the BTMUA's raw surface drinking water supply is contaminated with PFOA.

283.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, the BTMUA has incurred, is incurring, and will continue to incur damages related to PFOA contamination of its raw surface water supply in an amount to be proved at trial.

284.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA contamination of the BTMUA's raw surface water supply. Defendants committed each of the aforementioned acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably

might be harmed by those acts or omissions. Such conduct was performed to encourage and promote the sales of the Defendants' products, or to reduce or eliminate expenses Defendants would otherwise have incurred to remove PFOA from their waste streams, despite the impacts to the BTMUA's drinking water supply and on public health and welfare. Therefore, the BTMUA requests an award of punitive damages for the Defendants' especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future. The BTMUA requests an award of punitive damages in an amount to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

285.    Defendants are jointly and severally liable for all such damages, and the BTMUA is entitled to recover all such damages and other relief as set forth below.

## EIGHTH COUNT
### Fraudulent Transfer: Constructive Transfer
### (Against DuPont Defendants)

286.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 285 of this Complaint as if fully set forth herein.

287.    At all times relevant to the BTMUA's claims, the BTMUA is and was a creditor of the DuPont Defendants, including but not limited to the Chemours Defendants.

288.    Through the various spin-off transactions described in this complaint, the Chemours Defendants did not receive reasonably equivalent value from DuPont in exchange for the transfers of assets and assumptions of liabilities, and those transfers and assumptions of liabilities were made to or for the benefit of DuPont.

289.    When the transfers were made and the liabilities were assumed by Chemours, DuPont was in a position to, and in fact did, control and dominate Chemours.

290.    Chemours made the transfers and assumed the liabilities when it was engaged or was about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

291.    Chemours was insolvent at the time or became insolvent as a result of the transfers and assumptions of liabilities.

292.    At the time that the transfers and assumptions of liabilities, the DuPont Defendants intended for Chemours to incur, believed Chemours would incur, or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

293.    Because the details of the DuPont-Chemours spinoffs were confidential (and many details remain confidential), the BTMUA only recently had reason to believe that the DuPont Defendants, including but not limited to Chemours, assumed the liabilities associated with the misconduct alleged herein.

294.    As a result of the DuPont Defendants fraudulent transfers, the BTMUA has been harmed and is entitled to avoid the transfers and recover property or value transferred pursuant to Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34. As such, the BTMUA seeks this relief and other relief deemed appropriate.

## NINTH COUNT
### Fraudulent Transfer: Actual Transfer
### (Against DuPont Defendants)

295.    The BTMUA repeats and realleges each allegation of Paragraphs 1 through 294 of this Complaint as if fully set forth herein.

296.    At all times relevant to the BTMUA's claims, the BTMUA was and is a creditor of the DuPont Defendants, including but not limited to Chemours.

297.    Through the various spin-off transactions described in this complaint, Chemours did not receive reasonably equivalent value from DuPont in exchange for the transfers of assets and assumptions of liabilities, and those transfers and assumptions of liabilities were made to or for the benefit of DuPont.

298.    When the transfers were made and the liabilities were assumed by Chemours, DuPont was in a position to, and in fact did, control and dominate Chemours.

299.    The DuPont Defendants made the transfers and assumed the liabilities described herein with the actual intent to hinder, delay and defraud the creditors or future creditors of the DuPont Defendants.

300.    Because the details of the DuPont-Chemours spinoffs were confidential (and many details still are confidential), the BTMUA only recently had reason to believe that the DuPont Defendants, including but not limited to Chemours, assumed the liabilities associated with the misconduct alleged herein.

301.    As a result of the DuPont Defendants' fraudulent transfers, the BTMUA has been harmed and is entitled to avoid the transfers and recover property or value transferred pursuant to Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34. As such, the BTMUA seeks this relief and other relief deemed appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, the BTMUA demands judgment against Defendants as follows:

A.      Enter judgment in its favor and against Defendants on each Count of this Complaint;

B.      An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, and monitoring costs incurred by Plaintiff and will continue to be incurred by Plaintiff, or for which Plaintiff is or was legally responsible to comply with New Jersey's MCL and groundwater and soil cleanup target levels, or for which Plaintiff is or was legally responsible to comply with the USEPA MCL target levels;

C.      An order that Defendants are required to abate the nuisance Defendants have caused;

D.      An order voiding the DuPont Defendant's transfers to the extent necessary to satisfy Plaintiff's claims;

E.      An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to DuPont;

F.      An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

G.      An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

H.      An award of punitive damages;

I.    An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

Dated: August 2, 2024

**TRENK ISABEL
SIDDIQI & SHAHDANIAN P.C.**

 */s/ David L. Isabel*
David L. Isabel, Esq. (031231993)
Robert Roglieri, Esq. (113562014)
Zachary Poreman, Esq. (406302022)
290 W. Mount Pleasant Avenue, Suite 2370
Livingston, New Jersey 07039
Phone: (973) 533-1000
*Attorneys for Plaintiff,*
*Brick Township Municipal*
*Utilities Authority*

## DEMAND FOR JURY TRIAL

Pursuant to New Jersey Court Rules 1:8-1(b) and 4:35-1(a), the BTMUA demands a trial by jury in this action of all issues so triable.

Dated: August 2, 2024

**TRENK ISABEL
SIDDIQI & SHAHDANIAN P.C.**

 */s/ David L. Isabel*
David L. Isabel, Esq. (031231993)
Robert Roglieri, Esq. (113562014)
Zachary Poreman, Esq.  (406302022)
290 W. Mount Pleasant Avenue, Suite 2370
Livingston, New Jersey 07039
Phone: (973) 533-1000
*Attorneys for Plaintiff,*
*Brick Township Municipal*
*Utilities Authority*